Chad R. Fears, Esq. (SBN 6970)
Brody R. Wight, Esq. (SBN 13615)
Hayley E. LaMorte, Esq. (SBN 14241)
**EVANS FEARS SCHUTTERT MCNULTY MICKUS LLP**
6720 Via Austi Parkway, Suite 300
Las Vegas, NV 89119
702-805-0290
cfears@efsmmlaw.com
bwight@efsmmlaw.com
hlamorte@efsmmlaw.com

Thomas J. Sullivan, Esquire (*Admitted Pro Hac Vice*)
Joseph H. Blum, Esquire (*Admitted Pro Hac Vice*)
Kevin B. Dulaney, Esquire (*Admitted Pro Hac Vice*)
**SHOOK, HARDY & BACON L.L.P.**
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA  19103
215-278-2555
tsullivan@shb.com
jblum@shb.com
kdulaney@shb.com

*Attorneys for Defendant Zoetis, Inc.*

# UNITED STATES DISTRICT COURT
# FOR THE STATE OF NEVADA

| | |
|---|---|
| JENNIFER STEPHENS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZOETIS, INC.; and DOES I-XX, inclusive,<br><br>Defendants. | **Case No. 2:25-cv-00989-JAD-EJY**<br><br>**DEFENDANT'S MOTION TO DISMISS COMPLAINT**<br><br>**(Oral Argument Requested)** |

Defendant Zoetis moves to to dismiss the complaint and to strike class allegations. This Motion is based upon the Memorandum of Points and Authorities, the pleadings and papers on file, and any argument this Court may entertain.

**Dated: July 18, 2025**

        EVANS FEARS SCHUTTERT MCNULTY MICKUS

        By: /s/ Chad Fears
        Chad R. Fears, Esq. (SBN 6970)
        Brody R. Wight, Esq. (SBN 13615)
        Hayley E. LaMorte, Esq. (SBN 14241)
        6720 Via Austi Parkway, Suite 300
        Las Vegas, Nevada 89119
        Telephone: 702-805-0290
        Facsimile: 702-805-0291
        Email: cfears@efsmmlaw.com

        Thomas J. Sullivan, Esquire (*Admitted Pro Hac Vice*)
        Joseph H. Blum, Esquire (*Admitted Pro Hac Vice*)
        Kevin B. Dulaney, Esquire (*Admitted Pro Hac Vice*)
        SHOOK, HARDY & BACON L.L.P.
        Two Commerce Square
        2001 Market St., Suite 3000
        Philadelphia, PA 19103
        215-278-2555
        tsullivan@shb.com
        jblum@shb.com
        kdulaney@shb.com

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Librela is an FDA-approved monoclonal anti-body medication prescribed by veterinarians across the world for the control of pain associated with osteoarthritis in dogs. Not surprisingly, these dogs are usually older, have pre-existing conditions, and/or take concomitant medications. Librela cannot be administered without a veterinarian diagnosing osteoarthritis in a dog and then making a judgment that Librela is appropriate, taking into consideration the dog's age, overall condition, comorbidities, and current medication regimen.

Notwithstanding its approval and success in alleviating osteoarthritis pain in dogs worldwide, Plaintiff Jennifer Stephens alleges strict liability and negligence claims on behalf of a putative class of Nevada residents whose dogs were treated with Librela, regardless of whether their dogs allegedly experienced an actual injury. Plaintiff bases her claims on bare and general allegations that Zoetis misrepresented the safety and efficacy of Librela and/or omitted safety information from the warning labels for Librela. She does not even allege that her own dog suffered from osteoarthritis when the dog was treated one time with Librela or allege any information regarding her dog's age or health prior to that treatment. Yet, there is a suspiciously impressive alignment between the symptoms her dog allegedly experienced after being treated with Librela and the potential symptoms listed on the Librela label.

Plaintiff's claims fail for several independent reasons. *First*, Plaintiff has not (and cannot) allege concrete facts to support the element of causation, which is an essential element of both of her claims. Providing no information about her dog's age, condition and medication protocol prior to receiving Librela, she alleges that her veterinarian did not warn her about any of the fifteen potential adverse events listed on the Librela label, which explicitly or implicitly referenced the symptoms her dog allegedly experienced after being treated with Librela, and Plaintiff herself did not independently read the Librela label.

*Second*, to the extent that Plaintiff is asserting a design defect claim, it is preempted because drug manufacturers cannot alter FDA-approved drug designs unilaterally, and that is precisely what plaintiff demands in her complaint.

*Finally*, the claims are not appropriate for class treatment, and the class allegations should therefore be stricken under Rules 12(f) and 23(d)(1)(D). The putative class described in the Complaint is overly broad and, as conceived, would unquestionably contain a sizeable number of members with no injury because it is defined as any purchasers of Librela during the relevant time frame, regardless of whether the putative class members' dogs suffered any symptoms.

## FACTUAL BACKGROUND

**I.     FDA approved Librela after a rigorous and collaborative process**

The FDA approved Librela on May 5, 2023, after a rigorous and independent approval process, and Zoetis launched the product for sale in the United States in October 2023. Before that, the European Medicines Agency approved Librela for sale in the European Union in November 2020. Canada approved Librela in 2021. Japan and Australia approved Librela in 2022. Over 28 million doses of Librela have been distributed globally. *See* https://www.zoetisus.com/products/dogs/librela-a-new-era-in-treatment (last visited July 11, 2025).

The demanding path to approval of a new animal drug is a collaborative process requiring extensive and open communication about a development plan and number and types of studies between the new animal drug's sponsor, in this case Zoetis, and the FDA's Center for Veterinary Medicine ("CVM"). *See From an Idea to the Marketplace: The Journey of an Animal Drug through the Approval Process*, https://www.fda.gov/animal-veterinary/animal-health-literacy/idea-marketplace-journey-animal-drug-through-approval-process (last visited July 11, 2025).[1] CVM's ultimate approval of a new animal drug "means the animal drug is safe and effective when it is used according to the label." *Id.* "Safe" means safe for the animal, and "'[e]ffective' means the drug consistently does what it is expected to do." *Id.*

An animal drug's path to approval is, in CVM's words, a "rigorous journey" intended to protect the health of animals and people "by ensuring that only safe, effective, and high-quality

---

[1] The Court may properly take judicial notice of the material on the FDA's website. *Klein v. Bayer Healthcare Pharms., Inc.*, 2019 WL 3945652, at *1 n.1 (D. Nev. Aug. 21, 2019) ("I take judicial notice of the FDA safety announcement, which was published on its website.") (citing *Brandt v. Medtronic, Inc.*, 179 F. Supp. 3d 963, 965 n.1 (D. Nev. 2016) (taking judicial notice of FDA online public records)).

- 4 -

1  animal drugs make it to the market." *Id.* To prove safety and effectiveness, the sponsor typically
2  conducts both a safety and a field study. *Id*. "CVM reviews the results of the tests to determine if
3  the drug is safe and effective and meets the approval requirements." *Id.* Such testing was done on
4  Librela. *See* ECF No. 1, Ex. A at 2-12 (Compl.) ¶ 11 (citing Librela Label). The sponsor also
5  submits to CVM all proposed labeling, including the immediate container, package insert, outer
6  packaging, shipping label, and client information sheet. *See From an Idea to the Marketplace*.
7  "CVM reviews the exact language and formatting that will be on each piece of labeling," and
8  ensures both that "the labeling includes all necessary information to use the drug safely and
9  effectively and the risks associated with the drug," and that "the labeling is truthful, complete, and
10 not misleading." *Id.* For prescription animal drugs, which can be dispensed only by or on the lawful
11 written order of a licensed veterinarian, the following statement must appear on the label: "Caution:
12 Federal law restricts this drug to use by or on the order of a licensed veterinarian." *Id.*

**II.    Using any drug is not without risk**

The FDA and the manufacturer's collaboration does not end with approval, but continues after a new animal drug enters the market because it is anticipated that some undesirable outcomes will occur. *Cf. Postmarketing Adverse Event Reporting Compliance Program*, https://www.fda.gov/drugs/surveillance/postmarketing-adverse-event-reporting-compliance-program (last visited July 11, 2025). An integral component of the FDA post-approval process is the requirement that a manufacturer report adverse events to the FDA. *Id.* The FDA monitors the safety profile of all animal drugs after they reach the market, as widespread use of a drug in a large number of patients may uncover adverse events not observed prior to approval. *See id.* Pharmaceutical companies (drug sponsors) are required to report to the FDA all cases of adverse events they receive from the public, including pet owners and veterinarians. *See How to Report Animal Drug and Device Side Effects and Product Problems*, https://www.fda.gov/animal-veterinary/report-problem/how-report-animal-drug-and-device-side-effects-and-product-problems (last visited July 11, 2025). The FDA evaluates adverse events and other safety information as it becomes available. *Id.* When appropriate, the FDA works with the drug sponsor to address any concerns. *See, e.g.*, *Animal Drug Safety-Related Labeling Changes*, https://www.fda.gov/animal-

veterinary/drug-labels/animal-drug-safety-related-labeling-changes (last visited July 11, 2025). The FDA may request updates to drug labeling, post-approval studies, or require additional or more frequent reporting. *See, e.g.*, *Adverse Event Reports for Animal Drugs and Devices*, https://www.fda.gov/animal-veterinary/product-safety-information/adverse-event-reports-animal-drugs-and-devices (last visited July 11, 2025).

Adverse event reports, whether reported directly to the FDA, or reported to a drug sponsor like Zoetis, which then transmits them to the FDA, are **publicly available** in a searchable online database the FDA maintains and can include, "minor or major health events, but also complaints about product quality issues, lack of effectiveness, defective packaging, and other non-health-related issues." *See id*. Indeed, the Complaint cites a publicly available document on the FDA's website listing every reported adverse event to Librela between May 2023 and June 2024. Compl. at ¶ 23 n.2.

According to the FDA, "[a]dverse event data have limitations," and "it is rarely possible to know with a high-level of certainty whether the event was caused by the product." *See FDA Standard Adverse Event Review*, pg. 31 (Sept. 10, 2024), https://www.fda.gov/media/184483/download?attachmen (last visited July 11, 2025). Older dogs, as a group, suffer from health problems at greater rates than younger populations. *Id.* at pg. 20 (noting that aging in dogs is the "most important risk factor" and that such dogs have "pre-existing medical conditions and concomitant medications.").

### III. Plaintiff's bare bones allegations

Plaintiff filed this putative class action in state court, and Zoetis removed it to this Court. ECF No. 1; Compl. Plaintiff alleges that Zoetis "sold Librela without warning consumers of the dangerous adverse effects that have been reported thousands of times including but not limited to: lethargy, reduced appetite, behavior changes, weakness, urinary incontinence, worsening osteoarthritis symptoms, and death (the 'Adverse Events')." Compl. ¶ 6.

Plaintiff alleges that her veterinarian, whom she does not identify, treated her dog Sara with one dose of Librela on September 27, 2024. *Id.* ¶ 7. Plaintiff provides no information about Sara, such as her age, breed, health status prior to the treatment, or concomitant medications at the time

of the Librela treatment. Plaintiff does not even allege whether Sara was treated with Librela for osteoarthritis, or for an off-label purpose.

Plaintiff alleges that a few weeks after the treatment, Sara—of unknown age and health status—began experiencing some of the aforementioned symptoms, namely: behavior changes (such as hiding), reduced appetite, urinary incontinence, and lethargy. *Id.* ¶ 8. Conspicuously absent from the list of symptoms alleged on behalf of the putative class is an allegation that Sara experienced worsening osteoarthritis symptoms, or indeed any osteoarthritis symptoms before or after the Librela treatment. On February 7, 2025, over four months after receiving one Librela treatment, Plaintiff euthanized Sara as a result of her deteriorated quality of life. *Id.* ¶ 9.

Plaintiff includes in her Complaint the Librela label that was in use when Sara was treated with Librela. *Id.* ¶ 11. Based on field studies in the United States and Europe, the label warned of fifteen possible adverse reactions to Librela:

**ADVERSE REACTIONS**

The safety of LIBRELA was assessed in a masked, controlled 84-day US field study evaluating the effectiveness of LIBRELA for the control of pain associated with osteoarthritis. Enrollment included 272 dogs, 135 dogs treated with LIBRELA and 137 dogs treated with a negative control (sterile saline). The enrolled dogs were at least 1 year of age (1 to 17 years old), weighed between 1.8 to 62.7 kg and were of various breeds or non-purebred. Dogs were dosed at 28-day intervals and received up to three injections. The most common adverse reactions reported during the study are summarized in Table 2 below.

Table 2. Number (%) of Dogs with Adverse Reactions Reported in the US Field Study

| Adverse Reaction* | LIBRELA n (%) (Total N = 135) | Negative Control n (%) (Total N = 137) |
|---|---|---|
| Urinary tract infection | 15 (11.1) | 11 (8.0) |
| Bacterial skin infection | 11 (8.1) | 9 (6.6) |
| Dermatitis | 10 (7.4) | 8 (5.8) |
| Dermal mass | 8 (5.9) | 5 (3.6) |
| Erythema | 6 (4.4) | 5 (3.6) |
| Dermal cyst(s) | 4 (3.0) | 2 (1.5) |
| Pain on injection | 4 (3.0) | 2 (1.5) |
| Inappropriate urination** | 4 (3.0) | 1 (0.7) |
| Histiocytoma | 3 (2.2) | 0 (0.0) |

*An adverse reaction may have occurred more than once in a dog; only the first occurrence was counted.
** Of these, two dogs treated with LIBRELA were among those reported with a urinary tract infection.

The safety of LIBRELA was also evaluated in a masked, controlled 84-day European field study evaluating the effectiveness of LIBRELA for the control of pain associated with osteoarthritis. Enrollment included 281 dogs, 138 dogs were treated with LIBRELA and 143 treated with a negative control (sterile saline). The enrolled dogs were at least 1 year of age (1 to 17.5 years old), weighed between 1.7 to 66 kg and were of various breeds or non-purebred. Dogs were dosed at 28-day intervals and received up to three injections. The most common adverse reactions reported during the study are summarized in Table 3 below.

Table 3. Number (%) of dogs with Adverse Reactions Reported in the European Field Study

| Adverse Event Reported* | LIBRELA n (%) (Total N = 138) | Negative Control n (%) (Total N = 143) |
|---|---|---|
| Increased Blood Urea Nitrogen (BUN)** | 19 (13.8) | 7 (4.9) |
| Lethargy | 5 (3.6) | 0 (0.0) |
| Emesis | 4 (2.9) | 1 (0.7) |
| Anorexia | 3 (2.2) | 0 (0.0) |
| Lameness | 3 (2.2) | 1 (0.7) |
| Cough | 3 (2.2) | 1 (0.7) |

*An adverse reaction may have occurred more than once in a dog; only the first occurrence was counted.
** Two dogs treated with LIBRELA suffered serious adverse events and were euthanized during or after study completion: A 13-year old Bichon Frise had pre-existing increased urine protein-creatinine ratio and heart failure that worsened during study; the dog also had an increase in creatinine during the study and was diagnosed with renal failure and was euthanized 3 days after completing the study. An 8-year-old mixed breed dog had pancreatitis and was euthanized on Day 74. The remainder of the dogs that had elevations in the BUN did not have any obvious adverse events associated with this finding.

Notably, Sara's alleged symptoms correlate almost exactly with several of the potential adverse reactions listed on the Librela label. Sara allegedly experienced urinary incontinence, which was included on the label as "inappropriate urination." *Id.* She also experienced lethargy, which was listed on the label. *Id.* Relatedly, she allegedly experienced behavior changes such as

hiding, reduced appetite, and weakness which are associated with lethargy, which as noted was listed on the label. *Id.*.[2]

Notwithstanding the alignment between symptoms Sara allegedly experienced and those listed on the label, Plaintiff alleges that Zoetis' "failure to warn veterinarians and other professionals, by failing to include adequate warnings of the Adverse Effects in Librela's prescription information, was thereby passed on to Plaintiff and Class Members as the intended users Librela for their pets." *Id.* ¶ 13. Despite alleging that she "relies on her veterinarian's guidance in deciding to purchase[] pet medication, . . . and thereby relies by proxy on the representations that Defendant made to veterinarians and other professionals who incorporate those representations into their recommendations to the clients like" herself, she "*was not provided with any warning* that her dog could potentially experience any of the Adverse Effects prior to purchasing Librela." *Id.* ¶¶ 12, 14 (emphasis added). However, she goes on, "[h]ad [she] been provided with warnings that her dog *would experience the Adverse Effects*," Plaintiff would not have consented to the Librela treatment. *Id.* ¶ 15 (emphasis added). Although her complaint is devoid of a single fact about her veterinarian, or any other veterinarian, she somehow asserts that "[n]o reasonable veterinarian would recommend Librela if they knew about the prevalence of the Adverse Effects, thus no pet owners like Plaintiff or the Class Members would have purchased Librela, but for Defendant's failure to warn about the Adverse Effects." *Id.* ¶ 17.

As noted, Plaintiff asserts claims for strict liability and negligence. Plaintiff's strict liability claim is based on an allegedly deficient warning. In support, Plaintiff alleges that Zoetis "manufactured and sold Librela without adequate warning Librela caused the adverse events," and that "Librela was a defective product and unreasonably dangerous to the dogs who it was reasonabl[y] foreseeable would use it, because Defendant failed to warn consumers of the Adverse Effects." *Id.* ¶¶ 33, 34. It appears that Plaintiff is not bringing a strict liability claim based on an alleged design defect.

---

[2] *See Lethargy in Dogs: When To Worry*, https://www.petmd.com/dog/symptoms/lethargy-in-dogs#:~:text=Symptoms%20of%20lethargy%20include,Not%20acting%20like%20themselves (last visited July 11, 2025).

Plaintiff's negligence claim is based on allegations that Zoetis had a duty to "adequately" inform Plaintiff and the putative class members "of potential adverse reactions" to Librela, and "to avoid selling medication that was unreasonably dangerous for its intended use." *Id.* ¶ 39. Plaintiff further alleges that Zoetis "failed to exercise reasonable care in manufacturing, advertising, labeling, marketing, and selling" Librela." *Id.* ¶ 40.

Plaintiff defines the putative class as: "All persons within the State of Nevada who purchased Librela within five years prior to the filing of the Complaint through the date of class certification." *Id.* ¶ 28. She posits that there are "hundreds, if not thousands of individuals . . . who purchased the products within the applicable statute of limitations." *Id.* ¶ 28(a).

## **LEGAL STANDARD**

Rule 12(b)(6) mandates that a court dismiss a cause of action that fails to state a claim upon which relief can be granted. A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Thus, the Court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir. 1986). The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001). A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own case making a violation plausible, not just possible. *Ashcroft v. Iqbal,* 556 U.S. 662, 677-79 (2009) (citing *Twombly,* 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

# ARGUMENT

**I.  Plaintiff's bare bones, conclusory, self-contradicting, and self-defeating allegations fail to state a claim**

Plaintiff's allegations fail on a fundamental level, and to a degree that attempted resurrection through amendment would be futile. She has not, and indeed cannot, state a claim for strict liability or negligence based on her bare bones, conclusory, self-contradicting, and self-defeating allegations. The Complaint fails for three simple reasons. First, the symptoms Plaintiff alleges befell her dog Sara as a result of one treatment with Librela were either explicitly or implicitly included in the possible adverse events listed on the Librela label, which listed lethargy and inappropriate urination as possible adverse events. Zoetis warned of the effects that Plaintiff contends her dog experienced, and therefore Zoetis' liability cannot be established. Second, Plaintiff cannot establish causation in light of her allegations. She alleges that her veterinarian did not communicate to her *any* potential adverse effects of Librela that were all prevalent on the label. Given that Librela may only be administered with a prescription from a veterinarian, Zoetis cannot be liable under a failure to warn theory as Plaintiff's allegations indicate her veterinarian would not have communicated the information from an unidentified and theoretical different, allegedly superior, warning label. Along the same lines, Plaintiff's allegations make clear that she did not independently read the warning label, furthering eviscerating the causation element of her claims. Third, Plaintiff's negligent failure to warn claim is subsumed by her strict liability claim.

### A. Substantive Law

#### 1. Strict Liability

For her strict liability claim, Plaintiff must prove, "1) the product had a defect which rendered it unreasonably dangerous, 2) the defect existed at the time the product left the manufacturer, and 3) the defect caused the plaintiff's injury." *Fyssakis v. Knight Equipment Corp.*, 826 P.2d 570, 571 (Nev. 1992). The warning accompanying a product must "adequately communicate[] the dangers that may result from its use or foreseeable misuse; otherwise, the product is defective." *Id.* at 571-72; *see also Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1150 (9th Cir. 2005) ("A product may be considered unreasonably dangerous if consumers are

1  inadequately warned of an anticipated danger posed by a product of which the average consumer
2  would not already be aware." (applying Nevada law)). "[T]he burden of proving causation can be
3  satisfied in failure-to-warn cases by demonstrating that a different warning would have altered the
4  way the plaintiff used the product or would have prompted [the] plaintiff to take precautions to
5  avoid the injury." *Rivera v. Philip Morris, Inc.*, 209 P.3d 271, 275 (Nev. 2009) (citation omitted).

6  Under the learned intermediary doctrine, "a drug manufacturer is immune from liability to
7  a patient taking the manufacturer's drug so long as the manufacturer has provided the patient's
8  doctor with all relevant safety information for that drug." *Kwasniewski v. Sanofi-Aventis U.S. LLC*,
9  2018 WL 6566560, at *3 (D. Nev. Nov. 1, 2018) (citation omitted). Although the Nevada Supreme
10 Court has not explicitly endorsed the doctrine with respect to claims against drug manufacturers,
11 as it has with respect to claims against pharmacists, judges in this district have applied the doctrine
12 in this context. *Id.* at *3 n.1 (citing *Klasch v. Walgreen Co.*, 264 P.3d 1155, 1158 (Nev. 2011)
13 (noting that "[t]raditionally, the learned-intermediary doctrine has been used to insulate drug
14 manufacturers from liability"), and *Flowers v. Eli Lilly & Co.*, 2015 WL 12622058, at *2 n.3 (D.
15 Nev. July 10, 2015) ("In the absence of case law to the contrary, the Court believes that the Nevada
16 Supreme Court would apply the learned intermediary doctrine to prescription medicine product
17 liability cases.")); *see also Flores v. Merck & Co., Inc.*, 2022 WL 798374, at *5 (D. Nev. March
18 16, 2022) ("The learned intermediary doctrine traditionally immunizes drug manufacturers from
19 liability 'to a patient taking the manufacturer's drug so long as the manufacturer has provided the
20 patient's doctor with all relevant safety information for that drug' and shifts the responsibility to
21 the patient's doctor to "convey to the patient any information that the doctor deems relevant.")
22 (quoting *Klasch*, 264 P.3d at 1158).

23 The principles that form the basis for the learned intermediary doctrine in the context of
24 human drugs and physicians logically apply to animal drugs and veterinarians. *See, e.g.*, *Haste v.*
25 *Am. Home Prods. Corp.*, 577 F.2d 1122, 1125 (10th Cir. 1978); *see also Osburn v. Anchor Labs.*
26 *Inc.*, 825 F.2d 908, 913-14 (5th Cir. 1987); *Knapp v. Zoetis Inc.*, 2022 WL 989015, at *9 (E.D. Va.
27 Mar. 31, 2022). Veterinarians, like physicians, exercise their discretion and judgment in making
28 prescription decisions, are much better equipped than consumers to evaluate the benefits and risks

of a prescription animal drug, and serve as reliable means of ensuring that the drug's warning is received and understood.

### 2. Negligence

"To state a claim for negligence under Nevada law, a plaintiff must establish: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiff's injuries; and (4) plaintiff suffered damages. *Smith v. Wolf Performance Ammunition*, 2015 WL 2359063 (citing *Scialabba v. Brandise Constr. Co.*, P.2d 928, 930 (Nev.1996)). When appropriate, judges in this district have found negligence claims based on a failure to warn duplicative and subsumed by strict liability claims. *See, e.g., Ontiveros v. Coloplast Corp.*, 2022 WL 3084429, at *6 (D. Nev. Aug. 3, 2022) (concluding that negligence-based claims were "duplicative of and subsumed by . . . strict liability claims") (citing *Forest v. E.I. DuPont de Nemours & Co.*, 791 F. Supp. 1460, 1464 (D. Nev. 1992) (concluding that negligence and strict liability claims should be considered together "for purposes of considering Defendant's possible liability for failure to provide an adequate warning"), and *Forest v. Vitek, Inc.*, 884 F. Supp. 378, 380 (D. Nev. 1993) (noting that "there is no practical difference between an action in negligence for breach of one's duty to warn and an action in strict liability for a product defect due to inadequate warning or labeling").

### B. Plaintiff fails to state a claim for strict liability

First, as noted, Plaintiff alleges that Zoetis failed to warn her or her veterinarian about these possible adverse events, which is demonstrably false, because they are explicitly or implicitly listed on the label. (Compl. ¶ 11). Given the demonstrated alignment of Sara's symptoms allegedly caused by her Librela treatment and the possible adverse reactions listed by Zoetis on the label, Plaintiff's failure to warn claim cannot succeed. *See, e.g.*, *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 673-74 (S.D.N.Y. 2017) (applying California law and explaining on a motion to dismiss "[a] written warning is adequate if it directly warns in plain and explicit terms of the specific risk that has caused injury to the plaintiff.") (citing *Kearl v. Lederle Labs.*, 218 Cal. Rptr. 453, 467 (Ct. App. 1985)).

Even assuming the Librela warning was somehow deficient, Plaintiff's allegations create insurmountable barriers to establishing causation. She alleges that she "relies on her veterinarian's guidance in deciding to purchase[] pet medication" (*id.* ¶ 12), but that her veterinarian did not provide her with "any warning that her dog could potentially experience any of the Adverse Effects prior to purchasing Librela," including lethargy and inappropriate urination, which were on Librela's warning label. (*Id.* ¶ 14).

Plaintiff's allegations make it unmistakably clear that she did not read the label, and that her veterinarian did not advise her of any of the fifteen potential adverse events listed on the label. Moreover, she alleges that "[h]ad [she] been provided with warnings that her dog *would experience the Adverse Effects*," she would not have consented to the Librela treatment. (*Id.* ¶ 15) (emphasis added). In other words, had Plaintiff's veterinarian, who did not advise her of the list of fifteen rare, but possible, known side effects to Librela, instead advised her that Sara "would" experience the rare symptoms Sara ultimately experienced (which have not been experienced by the vast majority of dogs following the approximately 28 million administrations of Librela globally),[3] she would not have consented to her veterinarian administering Librela to Sara. Plaintiff's allegations make clear that she has not, and indeed cannot, establish that Zoetis caused Sara's symptoms by way of its allegedly defective warning label because the facts she has pled cannot be construed to mean that a different label would have stopped her from consenting to the Librela treatment. She cannot amend her way out of these self-defeating pleadings. Applying the applicable substantive legal framework makes this all the more clear.

The learned intermediary doctrine requires the dismissal of Plaintiff's claims because Zoetis warned Plaintiff's veterinarian about Librela's possible Adverse Effects in the FDA-approved warning label. Zoetis thus discharged its duty by warning Plaintiff's veterinarian by including the warning on a package insert. *See Flores*, 2022 WL 798374, at *5. Zoetis had no agency over what

---

[3] Plaintiff accurately notes that instances of the Adverse Effects have been reported "thousands" of times in the United States. (Compl. ¶ 23). Even putting aside the limitations of adverse event reporting and the fact that "it is rarely possible to know with a high-level of certainty whether the event was caused by the product" *see FDA Standard Adverse Event Review*, pg. 31, "thousands" of adverse events is quite the miniscule numerator when the denominator is millions of doses administered.

- 14 -

warnings the veterinarian chose or chose not to convey in his or her role as a learned intermediary with knowledge of Sara's age, condition, and concomitant medication.

And, if the learned intermediary doctrine does not apply here (it does), Plaintiff's claims still must be dismissed because her allegations make clear that she would not have received a warning from whatever unidentified hypothetical label she is advocating. Plaintiff alleges that, had she "been provided with warnings that her dog would experience the Adverse Effects, Plaintiff would not have purchased the Librela and would not have agreed to have it administered to her dog." (Compl. ¶ 15). She admits she relied exclusively on the veternarian's representations. (*Id.* ¶ 12). Indeed, a patient's agreement, or consent, to a medication arises from the relationship between doctor and patient (or guardian). Informed consent in the context of the veterinarian-client-patient relationship and administration of prescription medicines generally requires that the veterinarian disclose the risks and benefits of a drug, including by providing client information sheets.[4] A dog owner gives consent based on information a veterinarian provides. Plaintiff's complaint acknowledges and she cannot dispute that veterinarians play an essential role in the process of informing pet owners about a drug, and that consent is based on the information veterinarians communicate to pet owners. (*Id.*). Yet, Plaintiff alleges that her veterinarian did not provide her with "any warning that her dog could potentially experience any of the Adverse Effects prior to purchasing Librela," and she herself did not read the label, which contained warnings about the potential Adverse Effects of Librela. (*See* Compl. ¶ 14).

Even, assuming *arguendo*, that Librela's warning label was somehow deficient in terms of what adverse events it did and did not list, for Plaintiff's purposes, it is of no moment for two independent reasons. First, she did not read the label. Second, her veterinarian did not advise her of *any* of the fifteen potential adverse events listed on the label, so would not have conveyed what other (unidentified) information might have altered Plaintiff's consent. Given these allegations, she

---

[4] *Client Information Sheets – Take-Home Safety Knowledge*, available at https://www.fda.gov/animal-veterinary/animal-health-literacy/client-information-sheets-take-home-safety-knowledge (last visited July 11, 2025); *Overview of Veterinary Client Issues*, available at https://www.animallaw.info/article/overview-veterinary-client-issues#:~:text=According%20to%20the%20Journal%20of,drugs%20is%20recognized%20as%20necessary (last visited July 11, 2025)

1  cannot "demonstrate[e] that a different warning would have altered" her decision to consent to Sara being treated with Librela. *Rivera*, 209 P.3d at 275.

Simply put, Plaintiff has pleaded her way out of establishing causation. In order for her to establish causation with new allegations, her current allegations would have to be false.[5] But, they must be accepted as true. *See Kaplan,* 792 F.2d at 898. As such, Plaintiff's strict liability must be dismissed with prejudice.[6]

### C. Plaintiff's negligence claim is subsumed by her strict liability claim, and she otherwise fails to state a claim

The allegations underlying Plaintiff's negligence and strict liability claims are materially identical. Accordingly, the Court should hold that Plaintiff's negligent failure to warn claim is "duplicative of and subsumed by [her] strict liability claim," *Ontiveros*, 2022 WL 3084429, at *6, because "there is no practical difference between an action in negligence for breach of one's duty to warn and an action in strict liability for a product defect due to inadequate warning or labeling." *Forest*, 884 F. Supp. At 380.

Even if Plaintiff's negligence claim is considered, however, it runs headlong into the same fatal causation issue as her strict liability claim.

Accordingly, Plaintiff's negligence claim should also be dismissed with prejudice.

---

[5] For this reason, amendment would be futile. *See Bilderback v. Ocwen Loan Servicing, LLC*, 2017 WL 4079262, at *4 (D. Nev. Sept. 14, 2017) (noting that leave to amend should be granted under the Ninth Circuit policy unless the court "'determines that the pleading could not possibly be cured by the allegation of other facts,'" and dismissing without leave to amend where the plaintiff could not plead facts that would state a claim "[w]ithout completely changing the story") (quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 926 (9th Cir. 2012)).

[6] Furthermore, the Complaint is devoid of allegations that Sara suffered from osteoarthritis before or after receiving her Librela treatment, suggesting that this was an "off-label" prescription of Librela, which would cut off any potential Zoetis liability. *See, e.g.*, Little v. Depuy Motech, Inc., 2000 WL 1519962, at *9 (S.D. Cal. June 13, 2000) ("Dr. McKinley's decision to use DMI's device in an 'off-label' manner does not subject the manufacturer to lability, even if it knows of the off-label use."); *Huntman v. Danek Med., Inc.*, 1998 WL 663362, at *6 (S.D. Cal. July 24, 1998) ("In the absence of evidence that a doctor made the decision to use a product in an 'off-label' manner in reliance on a manufacturer's misrepresentations, claims for failure to warn . . . cannot stand.")

**II.    To the extent that Plaintiff raised a design defect claim, it is preempted**

To the extent Plaintiff brings a design defect claim, whether as part of her strict liability or negligence claim, it is preempted by federal law and must be dismissed. Pharmaceutical design-defect claims are preempted because drug manufacturers cannot alter FDA-approved drug designs unilaterally. *See Yates v. Ortho-Mcneil-Janssen Pharms., Inc.*, 808 F.3d 281, 300 (6th Cir. 2015). As the Supreme Court has explained, "[o]nce a drug—whether generic or brand name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients,'" which preempts state law requiring manufacturers to "alter[] [the] composition" of a drug. *Mut. Pharm. Co., v. Bartlett*, 570 U.S. 472, 477, 490 (2013) (citing 21 C.F.R. § 314.70(b)(2)(i)). Accordingly, any design defect claim Plaintiff may have brought should be dismissed as preempted.

**III.    Plaintiffs' class is not certifiable and should be stricken under Rule 12(f)**

Plaintiff seeks to represent a class of Nevada residents who purchased Librela treatments. Rule 23(c)(1) of the Federal Rules of Civil Procedure states that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Pursuant to Rule 12(f), courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," including class allegations. *Maldonado v. HSBC Mortgage Systs., Inc.*, 2017 WL 3496460, at *4 n.26 (D. Nev. Aug. 15, 2017).

This Court has explained that "[o]ne obvious way a class can be improper is if it is too broad because it contains numerous members who do not even have a claim against the defendant." *Id.* at *4 (citing *In re Deepwater Horizon*, 739 F.3d 790, 827 (5th Cir. 2014) (a class definition is overbroad if it "includes people who have no legal claim whatsoever"), and *In re Zappos.com, Inc.*, 2016 WL 2637810, at *8 (D. Nev. May 6, 2016) (dismissing class allegations because the proposed

class would encompass numerous people who many not have any "meaningful" claims against the defendant).

In *Maldonado*, the putative class was "effectively made up of every HSBC customer who ha[d] filed for bankruptcy" in the preceding two years, with no attempt by the plaintiff "to meaningfully limit his proposed class to persons who had plausible claims against" the defendant. *Id.* Although the plaintiff "suggest[ed] that his complaint otherwise indicate[d] that the claim he assert[ed] [wa]s for unauthorized credit pulls, . . . his proposed class [wa]s not limited in that way." *Id.* Accordingly, this Court granted the defendant's motion to strike the class allegations. *Id.*

Here too, the putative class is defined as any purchasers of Librela during the relevant time frame, regardless of whether the putative class members' dogs suffered the symptoms alleged by Plaintiff, or any symptoms whatsoever. This is an overly broad putative class that would contain a sizeable number of members with no injury and no claim against the defendant. *See also In re Zappos.com, Inc.*, 2016 WL 4521681 (D. Nev. Aug. 29, 2016) (denying reconsideration of decision striking class allegations and noting that, although "[i]t is possible that other individuals will suffer actual injury from the data breach, . . . there is no risk of real harm because the possible injury is not certainly impending and there is not 'a substantial risk that the harm will occur.'") (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Plaintiff's proposed class would impermissibly include many owners of uninjured dogs. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 51-58 (1st Cir. 2018). Such a class cannot stand, and no amount of discovery is going to change that fact. *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) (noting that "class certification [may] properly [be] denied without discovery where plaintiffs c[an] not make a prima facie showing of Rule 23's prerequisites or that discovery measures [are] "likely to produce persuasive information substantiating the class action allegations.") (quoting *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977)).

**CONCLUSION**

For the foregoing reasons, Plaintiff's claims should be dismissed with prejudice and the class allegations stricken.

Dated: July 18, 2025.

                                              EVANS FEARS SCHUTTERT MCNULTY MICKUS

*/s/ Chad R. Fears*
Chad R. Fears, Esq. (SBN 6970)
Brody R. Wight, Esq. (SBN 13615)
Hayley E. LaMorte, Esq. (SBN 14241)
6720 Via Austi Parkway, Suite 300
Las Vegas, NV 89119

Thomas J. Sullivan, Esquire (*Admitted Pro Hac Vice*)
Joseph H. Blum, Esquire (*Admitted Pro Hac Vice*)
Kevin B. Dulaney, Esquire (*Admitted Pro Hac Vice*)
**SHOOK, HARDY & BACON L.L.P.**
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA  19103
*Attorneys for Defendant Zoetis, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of **DEFENDANT'S MOTION TO DISMISS COMPLAINT** was served on counsel of record July 18, 2025, using the Court's CM/ECF System.

                                        */s/ Danue High*
                                        An Employee of Evans Fears Schuttert McNulty Mickus

- 20 -